IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| RHONDA L. ROSE, | ) | |
| | ) | |
| Plaintiff | ) | Civil No. 09-672-HU |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MARTIN R. COHEN
P.O. Box 1229
4040 Douglas Way
Lake Oswego, OR 97035

LINDA ZISKIN
3 Monroe Parkway, Suite P
Lake Oswego, OR 97035
        Attorneys for Plaintiff

DWIGHT C. HOLTON
Acting United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904

DAVID MORADO
Regional Chief Counsel
L. JAMALA EDWARDS
Special Assistant U.S. Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 901
Seattle, WA 98104-7075

     Attorneys for Defendant

HUBEL, Magistrate Judge:

     Plaintiff Rhonda L. Rose ("Rose") seeks judicial review of the Social Security Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income under Titles II and XVI of the Social Security Act ("Act"). This court has jurisdiction under 42 U.S.C. § 405(g).

     For the following reasons, I recommend the Commissioner's decision be AFFIRMED.

## PROCEDURAL BACKGROUND

     Born in 1958 (Tr. 81), Rose has a general equivalency degree (Tr. 97) and reports past work as a bank branch manager between 1989 and 2001. Tr. 92. Rose applied for DIB and SSI on July 16, 2002, alleging disability since June 20, 2001 (Tr. 81), due to fibromyalgia, neck, and back pain. Tr. 91. The Commissioner denied Rose's applications initially and upon reconsideration. Tr. 39-43, 544-48. An ALJ held a hearing on June 6, 2004 (Tr. 351-418), and subsequently found Rose not disabled on July 26, 2004. Tr. 12-24. Rose appealed that decision to this court, and the matter was remanded for further proceedings on September 12, 2008. Tr. 436-44. The ALJ held a second hearing on January 12, 2009 (Tr. 845-93), and again found Rose not disabled on April 1, 2009. Tr. 422-35. Rose again appeals to this court.

///

2 - FINDINGS AND RECOMMENDATION

## FACTUAL BACKGROUND

I.   **Medical Evidence**

    A.   **1998-2000**

Rose first sought treatment from psychiatrist Dr. Hoopes on July 30, 1998.  Tr. 272.  Dr. Hoopes diagnosed major depressive disorder and Attention-Deficit Hyperactivity Disorder ("ADHD") and characterized Rose's "main problem" as "goals not achieved due to inadequate attention."  Tr. 273-74.  Dr. Hoopes continued to make these diagnoses, with the same "main problem" annotation, on August 8, 1998, and on a monthly basis between January 25, 1999, and December 17, 1999.  Tr. 262-70.  During this time Dr. Hoopes noted Rose's complaints of fibromyalgia pain and memory problems, and prescribed Prozac, Topomax, Wellbutrin, Effexor, and dexedrine.  *Id.*

On December 17, 1999, Dr. Hoopes wrote a letter to an unidentified "Ms. McErlane" stating that Rose has been taking Prozac for the last two months, and that her depression has improved, but that Rose still has a Beck Depression Inventory of 33.  Tr. 260.  Dr. Hoopes also noted Rose's report that she attributes "most of her depression to her chronic pain," and that she is "irritable, impatient, and unmotivated due to her depression all of which would make it impossible for her to work as a branch manager now."  *Id.*  Finally, Dr. Hoopes noted that Rose took two community college classes, which Dr. Hoopes did not believe were equivalent to full-time employment.  Tr. 261.

On September 8, 2000, Rose telephoned Dr. Hoopes asking for a trazadone prescription.  Tr. 259.

    B.   **2001**

Rose sought regular acupuncture and chiropractic care throughout 2001.  Tr. 193-233.

Rose also reported a workplace injury to her shoulder and neck in June 2001. The record does not contain a specific report related to this incident, but instead contains Rose's reports to physicians that she injured her right arm and her neck at U.S. Bancorp during a series of chart notes produced in during the period that commenced in June 2001.

Chiropractor Ronald Clifton stated that Rose was "partially incapacitated" between June 20, 2000 and August 1, 2001. Tr. 199. On July 16, 2001, Clifton submitted a form to an unidentified Dr. Ogle stating that Rose had returned to work, but required further chiropractic treatment. Tr. 201. On June 25, 2001, Clifton submitted a form to U.S. Bancorp stating that Rose's work restrictions were due to repetitive strain injury and fibromyalgia. Tr. 212.

On July 24, 2001, treating physician and primary care provider Dr. Scott, or a member of his staff,[1] stated that Rose could work if she had an ergonomic work station. Tr. 243. On July 26, 2001, Dr. Scott noted Rose's reports of left shoulder and upper back pain, and diagnosed myofascial pain. Tr. 244. Dr. Scott summarized Rose's worker's compensation claim history on August 2, 2001, characterizing it as "confusing." Tr. 242. Here Dr. Scott wrote that Rose previously worked as a bank teller, and was presently seeing several physicians and an acupuncturist. Tr. 242. Rose reported to Dr. Scott on August 2, 2001, that she had a workplace injury due to working as a bank teller and entering 200-250 keypad transactions per day rather than the usual 100 transactions per day. Tr. 242. On August 29, 2001, Dr. Scott noted Rose's report of left neck pain that worsened with work activity. Tr. 238. Dr. Scott released Rose to light duty "next month" on August 30, 2001. Tr. 241. On September 18, 2001, Dr. Scott stated that Rose could work with her hands at waist level

---

[1]The record does not clearly indicate whether Dr. Scott or an assistant signed this statement.

4 - FINDINGS AND RECOMMENDATION

without reaching or pulling.  *Id.*

Dr. Scott continued to follow Rose's workplace injury on October 22, 2001.  Tr. 240.  On October 26, 2001, Dr. Scott spoke with Rose's employer, U.S. Bancorp, and stated that it was difficult for him to know if Rose's current complaints were related to her 1991 workplace injury or the fibromyalgia diagnosis Rose has carried since 1994.  *Id.*

Dr. McNabb wrote a letter to Dr. Scott on November 19, 2001.  Tr. 245-46.  Dr. McNabb stated that Rose's left shoulder and neck injury occurred in 1991 at U.S. Bancorp,[2] and that Rose has presently been off work since June 20, 2001.  Tr. 245.  Dr. McNabb wrote that examination findings suggested a diagnosis of "left upper extremity myofascial syndrome superimposed on fibromyalgia."  Tr. 246. Also on November 19, 2001, Dr. Scott examined Rose and diagnosed myofascial pain syndrome and possible suprascapular nerve impingement.  Tr. 236-37.

Rehabilitation physician Dr. Swan performed a worker's compensation examination on December 13, 2001.  Tr. 252, 299.  Dr. Swan noted clinical evidence of bilateral shoulder impingement syndrome, and stated that Rose could perform a job without reaching, abducting, or flexing her shoulder.  Tr. 252.  Dr. Swan also diagnosed repetitive motion syndrome, and noted that his examination showed no objective evidence of fibromyalgia "at this time."  *Id.*

**C.    2002**

Dr. Scott again referred Rose to Dr. Swan on February 4, 2002, noting that Rose reported that she still had significant pain.  Tr. 239.  Dr. Swan completed a "statement of continuing disability" associated with Rose's Worker's Compensation claim on May 8, 2002, stating that Rose could not

---

[2]The original chart notes associated with this condition are not in the record before this court.

perform work above waist level due to bilateral shoulder pain.  Tr. 301-02.

On December 19, 2002, a physician identified as Dr. Sackman stated that Rose appeared calmer with Effexor anti-depressant therapy.  Tr. 324.  The record does not indicate Dr. Sackman's specialty or whether he treated or merely examined Rose.

**D.    2003**

Dr. Sackman noted Rose's report that Effexor made her symptoms worse on January 21, 2003.  Tr. 323.  Rose again saw psychiatrist Dr. Hoopes on January 24, 2003, to establish treatment for major depression and ADHD.  Tr. 258.  Dr. Hoopes prescribed a stimulant, Strattera.  *Id.*  On February 11, 2003, Dr. Hoopes stated that Rose stopped taking Strattera due to increased depression, and prescribed another stimulant, Adderall.  Tr. 257.  Dr. Hoopes wrote that Rose continued to do well on Adderall on May 5, 2003.  Tr. 254.

Rose continued to seek weekly and biweekly chiropractic care between October 2, 2002, and November 4, 2003.  Tr. 287-94.  Chiropractor Lynne Jellum completed a worker's compensation disability form (Tr. 295-96) and wrote a letter on May 9, 2003, stating that she believed Rose had an "indefinite" inability to work.  Tr. 286, 297-98.  Jellum wrote on a physical capacity evaluation form that she based this opinion upon Rose's "history of fibromyalgia, scoliosis, and shoulder impingement syndrome."  Tr. 296.  Jellum's associated chart notes show Rose's reports of shoulder and back pain, as well, but do not show that Jellum or any physician made specific diagnostic conclusions.  Tr. 288-94.

On June 9, 2003, Dr. Swan completed a "physical capacities evaluation form" regarding Rose's worker's compensation claim.  Tr. 282-83.  He indicated that Rose could constantly lift less than ten pounds, frequently lift eleven to twenty pounds, occasionally lift twenty-one to fifty pounds,

and never lift over fifty pounds.  Tr. 282.  Dr. Swan made the same restrictions regarding Rose's ability to push and pull, and stated that Rose can occasionally climb, balance, stoop, kneel, crouch, and crawl.  *Id.*  Dr. Swan indicated that Rose can never reach above shoulder level, may frequently reach above waist level, and constantly reach below waist level.  Tr. 283.  He also stated that Rose could frequently handle, finger, feel objects.  *Id.*  Finally, Dr. Swan stated that Rose had no restrictions regarding her feet, no environmental restrictions, and that these various limitations are unlikely to change.  *Id.*

Dr. Hoopes completed an attorney questionnaire regarding Rose's mental impairments in July 2003.  Tr. 276-81.  Dr. Hoopes indicated that Rose met diagnostic criteria for an affective disorder (Tr. 276), and indicated that no evidence supported diagnoses of personality or anxiety disorders. Tr. 278-79.  Dr. Hoopes indicated that Rose has "slight" restrictions in activities of daily living and social functioning (Tr. 279), "frequent" deficiencies of concentration, persistence, and pace, and "never" experienced an episode of decompensation.  Tr. 280.  Dr. Hoopes explicitly indicated that Rose does not have a severe mental disorder.  *Id.*  At the bottom of the questionnaire, Dr. Hoopes wrote, "N.B. Ms. Rose meets criteria for ADHD as depression and [sic] ADHD has not been addressed in this form.  Her mental illnesses, however, do not limit her ability to work."  Tr. 280.

Rehabilitation physician Dr. Friedman examined Rose on November 13, 2003.  Tr. 319-21. Dr. Friedman noted Rose's history of neck and shoulder pain, which Rose believed caused her depression, which Rose in turn reported was primary reason for her two years off work.  Tr. 319. Dr. Friedman diagnosed fibromyalgia with eleven "tender spots" upon examination, and a sleep disturbance.  Tr. 321.  Dr. Friedman noted Rose's history of spinal scoliosis and pain disorder, and recommended treatment for Rose's sleep disturbance and home exercises.  *Id.*

7 - FINDINGS AND RECOMMENDATION

### E.    2004-2005

Rose sought care from chiropractor Eric Hayden on October 13, 2004.  Tr. 664.  Rose continued to seek chiropractic care between September 31, 2005, and November 2005.  Tr. 666-83. On November 22, 2004, Master Contracting, Inc., terminated Rose from her position because she could not work full time.  Tr. 343.  The termination notice does not indicate what work Rose performed, nor the period of employment.  *Id.*

### F.    2006

Rose reported chronic neck pain to Benton County Health Department physician Dr. Williams on January 17, 2006.  Tr. 731.  Disability Determination Services ("DDS")[3] examining physician Dr. Bleazard diagnosed chronic neck pain without neurological deficit on January 21, 2006.  Tr. 684.  Dr. Bleazard stated that examination did not show tender points compatible with a fibromyalgia diagnosis, and explicitly made no work-related restrictions.  Tr. 686-87.

Rose continued to seek chiropractic care in 2006.  Tr. 327, 339-42.  On May 2, 2006, an unidentified healthcare provider wrote a note on East Linn County Community Clinic letterhead stating that Rose should not work.  Tr. 334.

A physician identified only as Dr. Orwald, without clinic letterhead or an identified speciality, prescribed medical marijuana for Rose's fibromyalgia, neck, and shoulder pain on March 18, 2006.  Tr. 475.  Dr. Williams diagnosed chronic neck pain and chronic cannabis use on April 26, 2006.  Tr. 724.  Dr. Williams advised Rose to cease using cannabis and stated that he would not prescribe opiates.  *Id.*

---

[3]  DDS is a federally-funded state agency that makes eligibility determinations on behalf and under the supervision of the Social Security Administration pursuant to 42 U.S.C. § 421(a) and 20 C.F.R. §§ 404.1503; 416.903.

Dr. Williams evaluated Rose's neck pain on May 12, 2006. Tr. 722. Dr. Williams continued to treat Rose on May 26, 2006, prescribing medication for muscle spasms and ordering cervical spine x-rays. Tr. 720. Imaging studies on this date indicated degenerative joint disease at C5 and C6. Tr. 526, 721. Rose again complained of neck pain on June 28, 2006. Tr. 717. On August 2, 2006, Dr. Williams noted Rose's history of chronic pain. Tr. 715. Dr. Williams performed a trigger point injection at this visit without specifying the injection site in his chart note. Tr. 715.

Rose sought care at Linn County Mental Health ("LCMH") on September 13, 2006. Tr. 533-34. The intake counselor stated that Rose complained of depression. Tr. 533. Rose received a second intake interview on September 20, 2006 (Tr. 529-32), and treatment plan on September 26, 2006. Tr. 528.

Rose also received an intake evaluation from Linn County Adult Outpatient and Community Support Services on September 19, 2006. Tr. 749. A "mental health associate" diagnosed major depressive disorder, and noted that Rose was "hoping to seek validation of her condition through the process of being approved for disability benefits, but repeated denials are increasing her sense of hopelessness and despair." Tr. 751. Rose received another intake evaluation on October 9, 2006, from Linn County Department of Health Services, where Dr. Vandiver[4] assigned diagnoses of major depressive disorder and cannabis abuse. Tr. 754-56.

Rose visited the Emergency Room on October 28, 2006, complaining of back pain, and was diagnosed with chronic muscle pain. Tr. 478, 766.

Dr. Vandiver saw Rose for medication management on November 15, 2006. Tr. 753. On December 26, 2006, Rose reported that she was taking two doses of the antidepressant Zoloft per

---

[4]The record does not indicate Dr. Vandiver's medical specialty.

9 - FINDINGS AND RECOMMENDATION

week, and that she did not require the standard daily dose.  Tr. 748.

G.    2007

Dr. Vandiver provided medication management for Rose on March 22, 2007, and May 4, 2007. Tr. 744-46.  Imaging studies on May 2 and 3, 2007, showed normal left and right shoulders. Tr. 524, 525.  Internist Dr. Athay noted Rose's clinical presentation of "mild distress" on October 30, 2007.  Tr. 518.  An MRI on this date showed moderate degenerative disc disease at C5-C6.  Tr. 522.  On November 1, 2007, Dr. Athay cited Rose's reports of neck, chest, and left shoulder pain, which he stated was consistent with cervical disc disease.  Tr. 517.

Rose additionally phoned the Lane County Mental Health crisis line six times between May 8, 2007, and June 1, 2007.  Tr. 734-43.  During this period she complained that no state agency would help her, asked for money for massage and other treatments, and said she did not have the necessary financial resources to manage her pain.  *Id.*

H.    2008

On February 21, 2008, Dr. Athay diagnosed chronic neck pain, cervical sprain, and osteoarthritis.  Tr. 515.

Rose was voluntarily admitted to Good Samaritan Regional Medical Center, in Salem, Oregon, for psychiatric treatment on April 5, 2008.  Tr. 494.  Rose told admitting physicians that she was depressed with suicidal and homicidal ideation relating to her present disability application and her frustration that "nothing else out there will help her."  Tr. 488.  Her stay was expected to last ten to fourteen days.  Tr. 492.  Rose was discharged on April 23, 2008, with diagnoses of moderate  to severe major depressive disorder, dysthymia, chronic pain syndrome, and "cannabis dependence with medical marijuana."  Tr. 481.

Physical medicine specialist Dr. Rung evaluated Rose on April 15, 2008. Tr. 511-14. At this time Rose complained of pain in her neck, shoulders, and upper arms. Tr. 511. Examination was positive for sixteen of eighteen fibromyalgia trigger points. *Id.* Dr. Rung noted Rose's history of work-related injury "involving the cervical spine" in 1992,[5] and diagnosed bilateral shoulder impingement syndrome with marked limitations on examination, fibromyalgia characterized by generalized aching, hypothyroidism, depression with suicidal ideation, sleep apnea, and ADHD "by report." Tr. 513. A cervical spine MRI on April 16, 2008, showed mild central spinal canal stenosis at C4-C5 and C5-C6, and mild to moderate neural foraminal stenosis at C4-C5 on the right, and moderate to severe neural foraminal stenosis at C4-C5 on the left. Tr. 810. An imaging study on April 17, 2008, showed a normal left shoulder. Tr. 807.

Dr. Rung again evaluated Rose on April 22, 2008. Tr. 509-10. Dr. Rung diagnosed multi-level degenerative disc disease of the cervical spine, non-acute degenerative disc disease of the thoracic spine, depression with suicidal ideation, "myofascial tender points," and fibromyalgia. Tr. 510. Dr. Athay also diagnosed depression, anxiety, and degenerative disc disease of the cervical spine on April 28, 2008. Tr. 508. He continued these diagnoses and added a low thyroid hormone diagnosis on May 8, 2008. Tr. 507. On May 12, 2008, Dr. Rung stated that Rose's trigger point injections were "markedly beneficial" and noted "some improvement" in Rose' depression. Tr. 506.

Endocrinologist Dr. Hao diagnosed subclinical hypothyroidism on May 27, 2008. Tr. 505. Also on this date Dr. Rung diagnosed cervical disc disease with "cord myomalacia or edema" and foraminal narrowing, and performed trigger point injections. Tr. 502. On June 30, 2008, Dr. Athay

---

[5]The chart notes showing clinical examination findings and diagnoses pertaining to this original workplace injury are not in the record before this court.

performed a follow-up examination regarding his fibromyalgia diagnosis, and noted that Rose was receiving trigger point injections.  Tr. 501.  On July 7, 2008, Dr. Rung diagnosed cervical disc disease, "myofascial trigger points," and chronic left shoulder pain.  Tr. 499.  Dr. Rung recommended that Rose perform home exercise.  *Id.*

Dr. Athay continued to diagnose "chronic neck pain, cervical disc disease, fibromyalgia, depression, subclinical hypthyroidism, etc.," on August 25, 2008 and October 16, 2008.  Tr. 496-98.

Dr. Rung diagnosed mild cervical spine spondylitis, chronic bilateral shoulder pain, mid back pain, and depression secondary to these diagnoses on December 2, 2008.  Tr. 834.

**I.      2009**

Orthopedist Dr. Dodds evaluated Rose on February 5, 2009.  Tr. 830-31.  Dr. Dodds noted that Rose was currently working as a school assistant,[6] and diagnosed posterior neck pain, bilateral posterior shoulder impingement syndrome.  *Id.*  Dr. Dodds suggested that Rose seek consultation with a rheumatologist and a pain clinic.  Tr. 831.

**II.     Rose's Testimony**

**A.      Activities of Daily Living Report**

Rose completed an "Activities of Daily Living and Socialization" form for DDS on August 3, 2002.  Tr. 116-24.  She stated that she can do "only about 1/3" of her usual work due to her back and neck pain.  Tr. 119.  Rose also stated that she requires unidentified pain pills and aspirin to sleep.  *Id.*  She does laundry every two weeks, washes dishes once per week, sweeps every two weeks, and mops every two weeks.  *Id.*  Rose wrote that she shops for food every two weeks and clothing once

---

[6]Dr. Dodds did not note what school district employed Rose, nor the  dates of employment, nor whether Rose worked full time.

every six months, and that this activity is about one-third of what she did before her allegedly disabling condition began. Tr. 120. Rose wrote that her concentration is "bad because of pain," that she watches two hours of television per day (Tr. 121), and that she spends about one third of her time performing unidentified hobbies. Tr. 122. Rose wrote that she attends church, but she is in too much pain to be "very social." *Id.* Finally, Rose wrote, "whenever I engage in activities which I used to do I end up in pain and in bed." Tr. 124.

### B.    Pain Questionnaire

Rose completed a DDS pain questionnaire on August 3, 2002. Tr. 115-124. She stated that she has "stabbing pulling stiffness" in her neck and back. Tr. 115. Rose wrote that this pain lasts "all the time" and that any activity at a desk, computer, or "looking down" causes the pain. *Id.* Stress makes the pain worse, and pain pills and relaxation make the pain better. *Id.* Rose stated that she takes aspirin for pain medication. Tr. 116. Rose wrote that her mobility changes from day to day, and that she has to rest "½ way during any activity." *Id.*

### C.    Fatigue Questionnaire

Rose also completed a DDS "Fatigue Questionnaire" on August 5, 2002. Tr. 111-117. She stated that she first experienced fatigue in 1994, that she naps for two to three hours per day,[7] and that she must rest every fifteen to twenty minutes, or after any activity. Tr. 111. Rose stated that she occasionally takes walks, cleans her home, does laundry, cooks, and shops weekly, but cannot finish these tasks. Tr. 112. An "average day" for Rose "depend[s] on how I feel." Tr. 113. Rose indicated that she can walk for one hour, stand for zero hours, and sit for one hour before requiring rest. *Id.*

---

[7]There is no indication of why Rose naps, i.e. due to boredom, depression, lack of sleep, or pain.

She also indicated that she can occasionally bend, occasionally lift ten pounds, and can occasionally reach forward or up. *Id.* She indicated no medication side effects. Tr. 114.

### C.   Work History

Rose additionally completed a Work History Report on August 5, 2002. Tr. 100-107. Rose reported work as a customer service representative, bank branch manager, bank teller, and "proof operator" between 1989 and 1999. Tr. 100.

The record shows that Rose was employed by Master Contracting, Inc., in 2004 (Tr. 343), and that she worked as a school assistant in 2009. Tr. 830.

The ALJ and vocational expert at Rose's February 9, 2009 hearing additionally stated that Rose reported work as a waitress in 2005 and 2003. Tr. 892.

### D.   Hearing Testimony

#### a.   June 6, 2004 Hearing

Testimony from Rose's June 6, 2004, hearing spans sixty-eight pages of the record before this court. Tr. 351-418. Rose testified that she did not think she could perform work as a security monitor because she could not sit in one place, perform work on a concrete surface (Tr. 358), and "because it would drive me nuts." Tr. 359. Here Rose explained that she would have difficulty paying attention to a monitor due to her ADHD. Tr. 360-61. She also stated that she would be unable to perform an apartment manager job because "if I happened to do something that pulled my neck out and my shoulder out, and I needed time to recuperate, I would not have that time to recuperate. . . ." Tr. 364.

Rose further testified that she drove eight hours to her hearing (Tr. 365), and that while driving she had to keep "everything constantly moving, because its injured." Tr. 367. She testified

that her pain was between a five and an eight on a one-to-ten scale on the day of her hearing, (Tr. 368), and between a seven and a nine the previous day because she walked five miles. Tr. 369-70.[8]

Rose also testified that she takes fifteen aspirin per day, (Tr. 375) and that she has worked her way up to holding a book to read for one half hour. Tr. 377. She stated that she can stand two minutes, and stand up to twenty minutes if she can shift position. Tr. 379-80. Rose testified that she could lift a gallon of milk (Tr. 381), but then stated that she could not. Tr. 382. She also stated that she can use the telephone, but does not because some unspecified action "will kill me." Tr. 383.

Rose additionally testified that her pain affects her mood, and that when the blood flow in the back of her neck "quits" she cannot think and loses concentration. Tr. 386. She also stated that she must stretch throughout the day (Tr. 393-94, 402) and, in response to attorney questioning, stated that she must rest an hour per day. Tr. 394. Rose testified that she could concentrate until an assignment became boring. Tr. 396.

Regarding her work history, Rose first testified that at an unspecified date she returned to work as a bank teller after her 2001 workplace injury to her hands. Tr. 354-55. After six weeks she "had a doctor put me off work" due to increased hand pain. Tr. 356. Rose later testified that she worked as a waitress for an unspecified period in 2003 (Tr. 390), and later enrolled in vocational rehabilitation training. Tr. 391. Rose explained that she quit vocational rehabilitation because she was not qualified to work with handicapped people. Tr. 391.

Finally, Rose stated that she must be able to rest at all times, averaging one hour per day seven days per week. Tr. 392. She also stated that she must be able to stretch all day long. Tr. 393.

---

[8]It is difficult to understand Rose's testimony, which at the same hearing was that she could stand up to 20 minutes if she could shift positions as compared to her testimony that she walked five miles.

Regarding her concentration difficulties, Rose testified that she "can't hardly think at all," and that her mind wanders when she reads the newspaper. Tr. 394. She also stated that her pain interferes with concentration. Tr. 402.

  **b.**  **February 12, 2009 Hearing**

  In answer to the ALJ's questioning, Rose first testified that she was not in any school or training "for work," but that she was presently working as a substitute teacher's aid. Tr. 852-53. She stated that this work averaged approximately twenty hours per month. Tr. 853. Rose also stated that she was fired from her vocational rehabilitation job because she did not pass an unspecified test. Tr. 854-55.

  Regarding her limitations, Rose stated that she could not do anything "with my arms out in front of me for any length of time" (Tr. 862, 871, 882-83) because this "irritates the neck." Tr. 871. Rose stated that this limitation extends to driving one block, but that if she received chiropractor or massage treatment she could drive longer. Tr. 863-64. On a good day she must lay down at least once to relieve pain, and on a bad day she must lay down up to two or three times to relieve pain. Tr. 869, 870.

  Rose also stated that she is in constant pain and must lay down for an unspecified period, take pain medication, and have massage treatments. Tr.864-65. Her neck pain is exacerbated by looking down and "whatever movement." Tr. 865. Rose also testified that her shoulder hurts "pretty much all the time," ( Tr. 866), and that this pain worsens with any movement. Tr. 867.

  Regarding her fibromyalgia, Rose stated that it makes her tired, sore, and effects her memory. Tr. 872-74. Regarding her depression, Rose testified that her depression is a "separate issue" from her pain. Tr. 874. She testified that she is "ready to cry" on a daily basis due to her depression, and

that her depression exacerbates her fatigue and weakness.  Tr. 875.  Rose also testified that she has suicidal thoughts weekly, and calls the crisis line "all the time," on a weekly basis.  Tr. 476.

Finally, regarding her ADHD, Rose testified that she has difficulty staying on task, and again stated that watching a security monitor in a surveillance job would "just drive me insane."  Tr. 877.

## III.    Third Party Testimony

Rose's son, Britton Rose, completed a third party questionnaire addressing Rose's activities of daily living and socialization on August 5, 2002.  Tr. 126-37.  Britton Rose indicated that Rose lives with her mother in law, sees family members weekly, and starts conversations with family members.  Tr. 126.  He stated that Rose's conversations were appropriate and normal.  Tr. 127.  Britton Rose wrote "N/A" regarding Rose's grocery shopping and time outside the house, and indicated that Rose visits friends and relatives weekly.  Tr. 127.

Britton Rose also indicated that Rose visits with other people daily, gets along with friends well, receives visits from friends, and has normal conversations with friends.  Tr. 128.  He also stated that Rose can no longer cook.  *Id.*  Britton Rose indicated that Rose watches television, drives, and takes walks.  Tr. 129-30.  He indicated that Rose walks one mile once per week.  Tr. 130.  Britton Rose indicated that he did not know how frequently Rose prepared her own meals, performed personal grooming, performed housework (Tr. 132-33), or took medications.  Tr. 135.  Finally, Britton Rose indicated that Rose does not care for children or pets, reads self-help books, calls the bank, friends, and businesses, and handles money responsibility.  Tr. 134-35.  Britton Rose stated that Rose's activities are "different each day," that she no longer works due to disability, and that Rose's pain interferes with her ability to work on a regular basis.  Tr. 136.

///

17 - FINDINGS AND RECOMMENDATION

IV.    **Vocational Expert's Testimony**

a.       **June 6, 2004 Hearing**

The vocational expert at Rose's first hearing stated that Rose had no past relevant work. Tr. 407. The vocational expert subsequently testified that an individual able to perform a limited range of sedentary work, with additional sit-stand options and reaching limitations (Tr. 404-05), could perform work as an information clerk, caller operator, and food and beverage clerk. Tr. 407-411. He stated that an individual unable to sustain work eight hours per day, five days per week, due to pain would be unable to perform work in the national economy. Tr. 411-12. He also stated that an individual unable to sit for more than one hour in an eight hour workday would be unable to perform the indicated jobs, and that an individual who could work no more than three and one half hours per day would also be unable to perform work in the national economy. Tr. 414.

b.       **February 9, 2009 Hearing**

The vocational expert at Rose's second hearing stated that Rose's past relevant work included branch manager, teacher aid, and stocker. Tr. 890-91.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act. 20 C.F.R. §§ 404.1520; 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If she is, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement. 20 C.F.R. §§ 404.1509; 416.909;

404.1520(a)(4)(ii); 416.920(a)(4)(ii).  If the claimant does not have such a severe impairment, she is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment medically meets or equals a "listed" impairment in the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii).  If the determines that the impairment meets or equals a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  This evaluation includes assessment of the claimant's statements regarding her impairments.  20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3).  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by her impairments.  20 C.F.R. § 404.1520(e); Social Security Ruling ("SSR") 96-8p.

The ALJ uses this information to determine if the claimant can perform his past relevant work at step four.  20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv).  If the claimant can perform her past relevant work, she is not disabled.  If the ALJ finds that the claimant's RFC precludes performance of her past relevant work the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(f); 416.920(a)(4)(v); 416.920(f); *Yuckert*, 482 U.S. at 142; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  If the claimant cannot perform such work, she is disabled.  *Id.*

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F.3d at 1098.  If the process reaches the fifth step, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration

the claimant's residual functional capacity, age, education, and work experience." *Id.* at 1100.  If the Commissioner meets this burden the claimant is not disabled.  20 C.F.R. §§  404.1566, 404.1520(g); 416.966; 416.920(g).

## THE ALJ'S FINDINGS

The ALJ found that Rose's work after her alleged onset date did not constitute substantial gainful activity at step one.  Tr. 425.  At step two, the ALJ found the following severe impairments: "cervical degenerative disc disease as shown on MRI scan; thoracic multilevel degenerative disease, moderate, as shown on x-rays; bilateral shoulder impingement as diagnosed based on clinical signs; and myofascial pain based on diagnostic tender points."  Tr. 425 (internal citations omitted).

The ALJ found that these impairments did not meet or equal listed disorder (Tr. 427), and found that Rose's RFC allowed her to perform light work "except for no pushing and/or pulling over the shoulder level," with occasional bilateral overhead reaching, occasional over shoulder reaching, and "no exposure to heights where overhead reaching is necessary."  Tr. 428.  The ALJ subsequently found that Rose could not perform her past relevant work, but has transferable work skills.  Tr. 433. Drawing upon the vocational expert's testimony, the ALJ found that Rose could perform work in the national economy as an information clerk, food and beverage order clerk, and call-out operator. Tr. 434.  The ALJ therefore found Rose not disabled.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Batson v. Commissioner for Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "Substantial evidence" means "more than a mere scintilla, but less than a

preponderance." *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)(citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id.* (citing *Robbins v. Social Security Administration*, 466 F.3d 880, 882 (9th Cir. 2006)), *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Id.*, *see also Batson*, 359 F.3d at 1193.

## DISCUSSION

Rose asserts that the ALJ's April 1, 2009, decision failed to comply with this court's September 12, 2008, remand order.  She specifically alleges that the ALJ erroneously failed to find that Dr. Hoopes's opinion directed a finding of severe mental impairments at step two in the sequential proceedings, failed to consider all of Rose's limitations in her RFC assessment, and failed to consider whether's Rose's pain had a "psychological basis." Pl.'s Opening Br. 14-17.

An ALJ's failure to comply with a District Court's remand order may constitute reversible error.  *Sullivan v. Hudson*, 490 U.S. 877, 885-86 (1989).

On September 12, 2008, this court found that the ALJ's July 26, 2004, decision did not "consider all of the functional limitations attributable to plaintiff's depression and ADHD." Tr. 439. Here the court cited Dr. Hoopes's opinion, but did not make distinct findings or credit Dr. Hoopes's testimony.  Tr. 439.  In fact, the court concluded that "It is not clear from the record that the ALJ

would be required to find plaintiff disabled if the evidence the ALJ did not address in her opinion were credited." Tr. 441. The court only noted that "the ALJ did not mention Dr. Hoopes by name in his opinion," and concluded that the matter should be remanded for consideration of any resulting functional limitations that would effect Rose's RFC. Tr. 439.

The court now considers each of Rose's arguments in light of this order.

## I.    The ALJ's Step Two Findings

Rose contends that the ALJ's step two assessment of the opinions of Drs. Hoopes and Sackman failed to comply with this court's remand order.

### A.    Standards

At step two, the ALJ determines if the claimant has a "severe" impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it "significantly limits your ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see* also 20 C.F.R. § 404.1521. Such an impairment must last, or be expected to last, twelve months. 20 C.F.R. § 404.1509.

In assessing physician opinions, the ALJ must generally accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). If two opinions conflict, an ALJ must give "specific and legitimate reasons" for discrediting a treating physician in favor of an examining physician. *Id.*, at 830. The ALJ may reject a physician's opinion that is unsupported by clinical notes or findings. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

### B.    Analysis: Dr. Hoopes

The ALJ discussed Dr. Hoopes's opinion, as well as opinions of other mental health physicians and practitioners, in some detail in making his step two findings. Tr. 426-27. The ALJ

first noted Dr. Hoopes's July 2003 opinion that Rose's depression and ADHD did not limit her ability to work. Tr. 426. This record supports this finding, showing that in July 2003 Dr. Hoopes completed a disability questionnaire for Rose's attorney. Tr. 274-81. Dr. Hoopes stated that Rose meets diagnostic criteria for an affective disorder (Tr. 276-77), without maladaptive behavior patterns or an anxiety disorder (Tr. 278-79). Dr. Hoopes opined that Rose has slight restrictions in her activities of daily living, social functioning, frequent deficiencies in concentration, persistence, and pace, and no episodes of decompensation. Tr. 280. Dr. Hoopes stated that Rose did not have a "severe" mental impairment, and additionally wrote on the bottom of the form, "Her mental impairments, however, do not limit her ability to work." Tr. 280.

Rose's brief argues, without citation to the record, that Dr. Hoopes opined that she has "frequent deficiencies of concentration, persistence, and pace," and that this opinion should be credited because the ALJ allegedly ignored it. Pl.'s Opening Br. 15. Perhaps Rose refers to Dr. Hoopes's comments at page 280 of the transcript. This argument misconstrues Dr. Hoopes's overall opinion and the ALJ's citation to it. The ALJ's analysis of Dr. Hoopes's opinion complies with this court's remand order.

The ALJ also noted that Rose did not seek care from Dr. Hoopes between October 2, 2000, and January 24, 2003, and that Rose discontinued medication prescribed by Dr. Hoopes without his direction. Tr. 426. The record also supports these findings.

Finally, the ALJ noted that Dr. Hoopes stated that Rose's mood and affect were normal at Rose's last appointment with him. Tr. 426.[9] The record supports this finding, showing that Dr.

---

[9]The ALJ indicated that this appointment was in July 2003, but the ALJ's citation refers to a May 5, 2003, chart note, which was the last time Dr. Hoopes saw Rose in the record before this court. Tr. 254.

23 - FINDINGS AND RECOMMENDATION

Hoopes stated that Rose's "affect is broad and her mood euthymic."  Tr. 254.

The ALJ's assessment of Dr. Hoopes's opinion is therefore based upon the record and the correct legal standards.  Rose's discussion of Dr. Hoopes's opinion fails to point to any work-related limitations made by Dr. Hoopes improperly omitted from the ALJ's RFC assessment.  Pl.'s Opening Br. 15.   For all of these reasons the ALJ's analysis of Dr. Hoopes's opinion should be affirmed.

### B.   Analysis: Dr. Sackman

Rose also contends that the ALJ erroneously "ignored" the opinion of Dr. Sackman, again in defiance of this court's remand order.  Pl.'s Opening Br. 16.  The record before this court, which totals nearly nine hundred pages, contains two pages of chart notes produced by Dr. Sackman, which are labeled "Exhibit 17F."  Tr. 323-24.   The ALJ explicitly cited this exhibit.  Tr. 426.  Contrary to Rose's argument, Dr. Sackman also made no indication that he believed Rose's depression was "severe."  Tr. 323-24.   Rose's allegation that the ALJ "ignored" or misconstrued Dr. Sackman's opinion is therefore not based upon the record and should be rejected.

Rose also asserts that the ALJ failed to consider the side effects of her antidepressant medication by ignoring Dr. Sackman's opinion.  Pl.'s Opening Br., 16.  Dr. Sackman stated that an increased dose of Effexor made Rose "sedated and uncomfortable."  Tr. 323.  Rose fails to explain the manner in which this is inconsistent with the ALJ's step two findings.  The ALJ may consider medication side effects, and a claimant's reasons for failing to take medication, in his credibility findings.  SSR 96-7p at *3 (available at 1997 WL 374186).  Rose does not challenge the ALJ's credibility findings, and this argument is inapplicable to the ALJ's analysis of Dr. Sackman's opinion.

For all of these reasons, Rose fails to establish reversible error in the ALJ's step two

findings.  The court additionally notes that any step two errors are generally harmless where the ALJ proceeded beyond step two in the sequential analysis.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  This is because the dispositive issue is whether the ALJ omitted work-related limitations from the claimant's RFC assessment.

## II.    The ALJ's RFC Assessment

Rose also contends that the ALJ's failure to incorporate mental limitations in her RFC assessment constitutes noncompliance with this court's remand order.  Pl.'s Opening Br. 16. Rose again quotes this court's September 12, 2008, remand order stating that the ALJ's July 26, 2004 decision did not adequately consider functional limitations stemming from Rose's depression and ADHD.  Pl.'s Opening Br. 16.

A claimant's RFC assessment is the most she can do despite her impairments, and is based upon all evidence in a claimant's case record, including her testimony.  20 C.F.R. §§ 404.1545(a); 416.945(a).

As noted, this court's order explicitly declined to credit evidence.  Tr. 441.  The ALJ has now discussed Rose's depression and ADHD in detail (Tr. 425-27), and, as noted above, specifically cited Dr. Hoopes's opinion that these impairments caused no work-related limitations.  Tr. 426.  Rose points to no work-related limitations stemming from her mental impairments, citing only to the LCMH evaluation which stated that her "unresolved pain issues impact her sense of well-being and, I feel, contribute to her depressed mood."  Pl.'s Opening Br. 17 (citing Tr. 751).  This submission establishes no work-related limitations, nor does it establish that the ALJ committed reversible error by omitting such limitations from her RFC assessment. The ALJ's RFC finding should therefore be affirmed.

25 - FINDINGS AND RECOMMENDATION

III.    **Psychologically-Based Pain**

Finally, Rose submits that the ALJ "erred by failing to consider that there may have been a psychological basis" for her pain. Pl.'s Opening Br. 17. She states that this alleged omission is "flatly contrary to the remand instructions" of this court and cites the Commissioner's administrative ruling 96-70, which addresses a claimant's credibility regarding her symptoms. Pl.'s Opening Br. 18.

This court's remand order made no suggestion that the ALJ should consider Rose's "psychologically based pain." Tr. 436-42. That argument should therefore be rejected.

Rose's additional authority, SSR 96-7p n.3 states:

> The adjudicator must develop evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists, and the individual alleges pain or other symptoms, but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms.

SSR 96-7p at *9 n.3 (available at 1996 WL 374186). This language points to a setting where a claimant does not have an identified impairment responsible for her alleged symptoms. Rose's cervical degenerative disc disease, bilateral shoulder impingement, and myofascial pain disorder are all impairments capable of producing pain and other symptoms. Therefore, the reasoning cited in note three of the Commissioner's ruling is inapplicable.

Rose also cites examining physician Dr. Smolen's diagnosis of pain disorder associated with depression and a general medical condition, and again fails to point to any work-related limitations stemming from her alleged impairment. *Id.* Dr. Smolen examined Rose for DDS and vocational rehabilitation services on January 25, 2006, and diagnosed moderate recurrent major depression, "pain disorder associated with depression and a general medical condition," and

26 - FINDINGS AND RECOMMENDATION

marijuana dependence.  Tr. 690.  Dr. Smolen concluded, "I think she would be able to remember and understand with no impairment and concentrate and attend with no to possibly mild impairment.  I think she would be able to work were it not for the pain she feels."  Tr. 691.

The ALJ cited Dr. Smolen's findings.  Tr. 426.  The ALJ also found Rose not credible (Tr. 432), and found her testimony regarding the intensity and limiting effects of her symptoms not credible.  Tr. 433.  Rose does not challenge the ALJ's credibility finding, and this court additionally indicated that the ALJ provided sufficient reasons for discrediting Rose in his July 26, 2004 opinion. Tr. 41 n.3.  The ALJ was therefore not obligated to accept Rose's symptom testimony or Dr. Smolen's opinion to the extent that it was predicated upon Rose's symptom testimony.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ's opinion should be affirmed.

## CONCLUSION

Rose fails to show that the ALJ did not comply with this court's remand order.  Rose also fails to show that the ALJ inappropriately evaluated Dr. Hoopes's opinion, her RFC assessment, or any "psychologically-based pain."  The ALJ's findings are based upon the record and the proper legal standards and should therefore be affirmed.

## RECOMMENDATION

The Commissioner's decision that Rose is not disabled under Titles II and XVI of the Social Security Act is based upon correct legal standards and supported by substantial evidence.  The Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge

27 - FINDINGS AND RECOMMENDATION

for review.  Objections, if any, are due October 18, 2010.  If no objections are filed, review of the

Findings and Recommendation will go under advisement on that date.  If objections are filed, any

party may file a response by November 4, 2010. Review of the Findings and Recommendation

will go under advisement when the response is due or filed, whichever date is earlier.

IT IS SO ORDERED.

DATED this 28th day of September, 2010.

/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge